UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT ASHLAND

ASHLAND HOSPITAL CORPORATION,
D/B/A KING'S DAUGHTERS MEDICAL
CENTER

PLAINTIFF

v.

AFFILIATED FM INSURANCE COMPANY

*Serve process agent by Certified Mail*:
    John J. Pomeroy
    270 Central Avenue
    Johnston, Rhode Island  02919

DEFENDANTS.

CIVIL ACTION NO. _____

## COMPLAINT FOR DECLARATION OF RIGHTS

The Plaintiff, Ashland Hospital Corporation, d/b/a King's Daughters Medical Center

(hereinafter "KDMC"), alleges:

### NATURE OF ACTION

1.      This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201 and 28

U.S.C. § 2202, for the purpose of determining a question of actual controversy between the

parties as more fully set out below.

### JURISDICTION AND VENUE

2.      KDMC is a Kentucky corporation with its principal place of business in Ashland,

Kentucky.

3.      The Defendant Affiliated FM Insurance Company (hereinafter "Affiliated FM"),

is a Rhode Island Corporation, with its principal place of business in Johnston, Rhode Island.  Its

registered agent for service of process is John J. Pomeroy, 270 Central Avenue, Johnston, Rhode

Island 02919.

4.       Affiliated FM is actively licensed to sell insurance in the Commonwealth of

Kentucky (License No. 300108), and has sold insurance policies in Kentucky, including the

policy at issue in this action.

5.       The Plaintiff being a citizen of the Commonwealth of Kentucky, and the

Defendant being a citizen of Rhode Island, and the matter in controversy exceeding the sum of

$75,000, exclusive of interest, attorney's fees, and costs, this Court has jurisdiction pursuant to

28 U.S.C. § 1332.

6.       This court is a proper venue for this action under 28 U.S.C. § 1391 because a

substantial part of the acts or omissions giving rise to the insurance dispute occurred in this

judicial district.

## FACTUAL ALLEGATIONS

### The Affiliated FM All Risk Property Insurance Policy

7.       In 2007, KDMC engaged the technology company EMC² to sell, install and

thereafter service a new DMX4 computer network in KDMC's data center.  The DMX4 runs a

number of essential hospital functions, is critical to patient health and safety, and requires the

highest availability and dependability.  In fact, the DMX4 is designed by EMC² to run enterprise-

critical applications that require the highest availability.  EMC² markets the DMX4 as its highest

performing, highest capacity and most functionally capable network. (*See*

http://www.EMC.com/products/series/symmetrix-dmx-4.htm#/2)

8.       On or about March 24, 2010, a dedicated air conditioning unit within KDMC's

data center suddenly failed, resulting in excessively high temperatures in the data room for an

extended period of time.  As a result of the excessively high temperature, KDMC's DMX4

computer network overheated and failed.

9.      Affiliated FM sold KDMC All Risk Property Coverage, Policy # MG760 (the

"Policy") providing $500,000,000 of property insurance, with separately identified coverage sub-

limits of $5,000,000 for damage to Electronic Data Processing, Data and Media.  (*See*, the Policy

attached as Exhibit 1)

10.     Affiliated FM's Policy promised to provide KDMC property coverage for "[a]ll

risks of physical loss or damage to insured property…" as defined within the Policy.  The Policy

expressly covers loss or damage to Electronic Data Processing Media and Data and Electronic

Data Processing Equipment, including losses caused by extremes or changes of temperature.

### The physical damage to and replacement of KDMC's computer network.

11.     EMC² imposes strict temperature parameters for operation of the DMX4.  EMC²'s

DMX4 network specifications state that the maximum system level operation temperature may

not exceed 32° C (89.6° F).  As a result of the failure of the air conditioning unit dedicated to

KDMC's data room, all components that record temperatures within the DMX4 network posted

high temperature alarms with an average temperature of all components reading 68.7° C (155.7°

F).  Some components recorded a maximum of 76° C (168.8° F).

12.     The high temperature caused several disk drives in the DMX4 network to go

offline, including the failure of multiple link control cards and back adapters alarms.  The high

temperatures resulted in the unavailability of multiple disk drives which impacted KDMC

production system servers.

13.     The DMX4 network is incredibly sophisticated and complex, and its operations

are largely proprietary to EMC², which not only manufactured the network, but also supports it

as well.  EMC²'s expertise with regard to the DMX4 and similar networks is unparalleled.  Thus,

when an issue arose relative to the condition and reliability of the DMX4 network after the

sudden air conditioner failure, KDMC naturally turned to EMC².

14.     EMC² is known as an elite supplier and supporter of the DMX4 type of

enterprise-critical network management and storage network, and it has very few competitors

who can provide comparable equipment and support.  EMC² as the manufacturer, installer and

supporter of the DMX4 analyzed the loss and provided a written analysis and recommendation to

KDMC. (*See* EMC² Event Report and subsequent reports from EMC², collectively attached as

Exhibit 2).  EMC² concluded that the DMX4 was "severely compromised."  It was not designed

for temperature extremes like those experienced at the KDMC data center, and as a result, EMC²

could no longer confirm the long term reliability of the DMX4.  The exposure to high

temperature took the DMX4 out of the scope of EMC²'s warranty and maintenance coverage.

Finally, EMC² recommended without qualification "that the subject DMX4 network be

replaced."

15.     EMC²'s report conclusively establishes a physical loss or damage to the DMX4

network, thereby establishing Affiliated FM's obligation to reimburse KDMC's losses and

damage under the Policy.

16.     Consistent with EMC²'s recommendation, KDMC replaced the DMX4 unit at a

cost of $1,973,946.40 (*See* Invoices, attached as Exhibit 3).  Additionally, KDMC incurred

various expenses related to repair work as a result of the incident, totaling $17,446.35.  (*See*

Invoices, attached as Exhibit 4).

17.     EMC² could not and in fact refused to guarantee the continued reliability of the

DMX4, and thus could not restore the DMX4 network to reliable functionality.  Full replacement

of the DMX4 network was KDMC's best and only alternative to prevent further loss.  Had

KDMC instead ignored EMC²'s recommendation and risked the unreliability and data integrity

issues, KDMC would have exposed itself, its insurers, its employees, and its patients to

substantial additional losses, including, but not limited to, interruption of its business, loss of

Electronic Data Processing, as well as damages resulting from the failure of critical hospital

functions, including those directly supporting patient care.  Many of these losses would have

been covered by Affiliated FM's insurance policy.  Under the circumstances, KDMC had no

choice but to mitigate its own exposure, and the exposure of third parties including Affiliated

FM, by replacing the DMX4 network consistent with the unqualified recommendation of EMC².

## KDMC made a claim under its All Risk Property Insurance Policy which Affiliated FM Disclaimed.

18.     KDMC timely made a property damage claim under the Policy to Affiliated FM,

including providing the EMC² Event Report and subsequent reports to Affiliated FM.

19.     Losses to Electronic Data Processing Media and Data are valued at the cost to

restore or replace the property with other of like kind and quality.  Losses to unrepairable

Electronic Data Processing Equipment are valued at the cost to replace with equipment that is the

most functionally equivalent to that damaged.

20.     Based on the Event Report and subsequent reports from EMC², the DMX4

network could not be repaired, but instead had to be and was replaced with the most functionally

equivalent unit.

21.     By way of a letter dated December 16, 2010, Affiliated FM acknowledged that if

the DMX4 network was "compromised," then it was "damaged."

22.     Notwithstanding the unequivocal and undisputed statements by EMC² that the network "has been severely compromised," Affiliated FM maintains that it needs additional information to conclude that the DMX4 network was "physically damaged and requires a complete replacement," and "[i]f there is no evidence substantiating physical damage to this equipment, there is no recovery under the Affiliated FM policy." (*See* various Correspondence from Affiliated FM, collectively attached as Exhibit 5).

23.     In response, KDMC advised Affiliated FM of established case law providing that the loss of functionality of a computer network renders the unit physically damaged for purposes of insurance coverage. (*See* November 15, 2010 Correspondence to Affiliated FM, attached as Exhibit 6).  Because EMC² cannot guarantee the reliability of the DMX4 network, and furthermore, has documented that the network was severely compromised, KDMC has lost the "functionality" of the DMX4 network, thereby rendering the unit physically damaged.  *See, American Guar. & Liab. Ins. Co. v. Ingram Micro, Inc.,* 2000 U.S. Dist. LEXIS 7299, *6 (D. Ariz. 2000) ("Physical damage is not restricted to the physical destruction or harm of computer circuitry but includes loss of access, loss of use, and loss of functionality.").  In *Ingram,* the court found a computer network was physically damaged for a period of time before it was fully restored.  *See also Southeast Mental Health Center v. Pacific Ins. Co.,* 439 F. Supp. 2d 831, 838 (W.D. Tenn. 2006) (finding that pharmacy computer sustained direct physical damage, within meaning of business interruption provision of policy, when unable to function).  In reaching this conclusion, the court cited statutes that addressed computer damage in a variety of noninsurance-related contexts and noted that "[l]awmakers around the country have determined that when a computer's data is unavailable, there is damage; when a computer's services are interrupted, there

is damage; and when a computer's software or network is altered, there is damage." *Ingram* at *8.

24.     Affiliated FM made no effort to distinguish the case law cited by KDMC, or otherwise address the unequivocal and undisputed findings and recommendations of EMC². Instead, Affiliated FM continues to maintain that the DMX4's exposure to excessive temperatures, failed disc drives, the additional service calls, and the conclusions of EMC² do not substantiate that the DMX4 suffered any physical loss or damage.

25.     Affiliated FM thereafter demanded that the DMX4 be tested, and that"[t]esting of [KDMC] owned property would need to be taken by a vendor hired by [KDMC]." Affiliated FM also insisted that KDMC obtain additional information from EMC regarding the equipment's operation design and manufactured specifications. (*See*, December 3, 2010 correspondence, attached as Exhibit 5).

26.     No language within the Policy requires that KDMC retain vendors to test the DMX4 or obtain information from third-parties such as EMC.

27.     Affiliated FM's insistence that KDMC engage an outside consultant to test the DMX4 network would serve no purpose, and ignores the reports from EMC² and the established law.  As the manufacturer and supporter of the DMX4, EMC² possesses direct and personal knowledge of all information necessary to conclude that the DMX4 was severely compromised, was not reliable, and therefore needed to be replaced.  Any contrary opinion given after-the-fact by third parties, including consultants engaged or recommended by Affiliated FM, would be inherently unreliable and inadequate to dispute the conclusions of EMC², which is well known as an elite supplier and supporter of the DMX4 type of enterprise-critical network management and storage network.  And such an opinion would not diminish KDMC's reasonable reliance on

EMC²'s recommendation.  Finally, even if the conclusions of EMC² could be debated, its warning that the DMX4 was not reliable, combined with EMC²'s refusal to provide ongoing warranty or maintenance coverage gave KDMC no recourse except to replace the DMX4.

## CLAIM FOR DECLARATORY JUDGMENT

28.     For the reasons stated above, an actual controversy between the plaintiff defendant exists within the jurisdiction of this Court involving the rights and liabilities under a contract of liability insurance, and this Court may issue a judgment resolving this controversy without other suits.

29.     KDMC requests the court to construe the Policy under Kentucky law, which provides well-established principles for the interpretation and construction of all insurance contracts, and to declare that the Policy provides coverage for KDMC's losses and damages, and that Affiliated FM must reimburse KDMC for its losses and damages which equal the costs to replace the DMX4 network in the amount of **$1,973,946.40,** to make repairs as a result of the incident in the amount of **$17,446.35**, plus interest that continues to accrue**.**

## RESERVATION OF KDMC'S RIGHTS.

KDMC reserves the right to seek consequential or other relief to which it may now or in the future be entitled, including but not limited to a judgment for attorney fees and all other expenses incurred by KDMC in obtaining the insurance coverage which it purchased from Affiliated FM.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff, KDMC, requests:

(a)     A declaration as to whether the Policy provides coverage for KDMC's damages and losses identified herein;

(b)     A trial by jury on all issues so triable;

(c)     A speedy hearing pursuant to Fed. R. Civ. P. 57;

(d)     Recovery of its costs and attorney fees incurred herein; and

(e)     Any and all further relief to which it may appear entitled.

Respectfully submitted,


/s/ *John M. Famularo*
John M. Famularo
Marshall R. Hixson
Kristen Orr
STITES & HARBISON, PLLC
250 W. Main Street, Suite 2300
Lexington, KY   40507
Telephone :  (859) 226-2300
Email: mhixson@stites.com
          jfamularo@stites.com
          korr@stites.com