**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CIVIL ACTION NO. 11-16-DLB-EBA**

**ASHLAND HOSPITAL CORPORATION**                                    **PLAINTIFF**
**d/b/a KING'S DAUGHTER'S MEDICAL CENTER**

**VS.**                                   **MEMORANDUM OPINION AND ORDER**

**AFFILIATED FM INSURANCE COMPANY**                          **DEFENDANT**

\* \* \* \* \* \* \* \* \*

This matter is currently before the Court on Plaintiff's Renewed and Restated Motion for Declaratory Judgment (Doc. # 70) and Defendant's Motion for Summary Judgment (Doc. # 71). These motions are fully briefed and thus ripe for review. (*See* Docs. # 70-1, # 71-1, 86, 91, 92, & 100). For the reasons set forth below, the Court will: (1) **grant** Plaintiff's Renewed and Restated Motion for Declaratory Judgment as to coverage, and **grant it in part and deny it in part** as to damages; and (2) **deny** Defendant's Motion for Summary Judgment as to coverage, and **grant it in part and deny it in part** as to damages.

## I.    FACTUAL BACKGROUND

**A.     The Hospital purchases a data storage network**

In 2007, Plaintiff Ashland Hospital Corporation, d/b/a King's Daughter's Medical Center, contracted with technology company and manufacturer, EMC Corporation, to sell, install and support a computer data storage network known as the DMX4. The DMX4 is

1

the Plaintiff's "primary computer data repository, which runs a number of essential hospital functions and is critical to patient health and safety." (Doc. # 70-1, at 6). Plaintiff used the DMX4 to store all of its electronic records, including medical records, schedules, and lab reports. EMC "markets the unit as having the highest degree of availability—99.999%," (Doc. # 69-1, at 5), and thus the unit's guarantee of information availability is its key feature. EMC installed the DMX4 within one of Plaintiff's data centers and monitored it in real-time from a remote location.

## B.  The Hospital's data center overheats

On March 24, 2010, the air conditioning equipment in the data center failed, causing elevated temperatures (hereinafter "the overheat event"). Alarms within the DMX4 alerted EMC that various component parts of the unit had been exposed to increased temperatures. The DMX4 ultimately went into a failed state, rendering the system unavailable for a period of several hours. During this period, Hospital personnel could not access important information including physician orders, patient schedules, and historical medical records. Certain data was "completely corrupted and had to be restored from a backup." (Doc. # 70-2, at 25).

## C.  The Manufacturer assesses the potential damage to the data storage network

Plaintiff contacted EMC to assess the DMX4's condition. EMC's analyzed internal temperature readings from the DMX4, as well as the over-temperature "error codes" and "event logs" self-reported by the unit. These codes and logs require at least some explanation. The DMX4 contains sophisticated self-diagnostic software that enables it to report certain problems it experiences. (Doc. # 69-3, at 9). Specifically, it contains a

Symmetrix platform with software that can "call home [to the manufacturer] with event logs and error codes" that indicate whether components have failed or otherwise suffered potential damage or weakening.  (*Id.* at 12-13).  EMC can monitor these event logs and error codes in real-time, and did so here.  According to EMC engineer Frederick Sproule, the event logs from the overheat event showed that hundreds of DMX4 components failed from thermal over-temperature conditions.  (*Id.* at 13-14).  Some drives reported "media errors" meaning that they either could not read new data, or could not have new data written onto them.  (*Id.* at 17).  Other drives reported hardware errors, including "catastrophic disk drive fault, where it's bypassing – it's telling the link control card that, 'I'm going away, and I can't communicate anymore.'"  (*Id.*).

Based on all available data, EMC prepared an Event Report which concluded that the unit had been "severely compromised" from exposure to above normal temperatures.  (Doc. # 70-3, at 5).  Accordingly, EMC advised Plaintiff that it could "no longer confirm the long term reliability" of the exposed equipment.  (*Id.*).  It further advised that the overheat event took the unit outside the scope of EMC's standard warranty and maintenance coverage.  (*Id.* at 6).  It recommended that Plaintiff replace the unit "due to the long term reliability and data integrity issues" flowing from the overheat event.  (*Id.*).  As explained more fully below, Frederick Sproule was later deposed and offered his expert opinion that the damage to the  DMX4 was "severe, extreme, excessive, very damaging . . . catastrophic," (Doc. # 69-3, at 52); that the DMX4 had suffered a loss of reliability; and that replacement was necessary.

Following EMC's recommendation, in October of 2010 Plaintiff replaced the DMX4 with a new system called a "VMAX."

3

**D.     The Insurer investigates the alleged loss**

Plaintiff had insured the DMX4 under an all risks insurance policy issued by Defendant Affiliated FM Insurance Company.   Promptly following the overheat event, Plaintiff notified Defendant of what had occurred.   Defendant hired Amir Rubin of LWG Consulting, an electrical engineer, to evaluate the potential damage suffered by the DMX4. Rubin conducted a two-year investigation, which included "(1) visiting the site and meeting with [Plaintiff] on three occasions, (2) performing dozens of hours of technical research, (3) reviewing thousands of pages of technical documents and discovery, and (4) attending the deposition of [EMC's Frederick Sproule] . . . ."  (Doc. # 69-1, at 7).  Two years into his investigation, Rubin concluded that he could not form an expert opinion regarding the DMX4 without further information, including physical testing of the unit.   Accordingly, he engaged a third-party firm, Emergent SX, to develop a protocol for testing the DMX4.

**E.     The Insurer denies coverage and Plaintiff files suit**

For reasons unexplained, Defendant did not permit Rubin to complete his investigation.  Rather, it retained Frank Lombardo, another electrical engineer and a co-employee of Rubin's from LWG Consulting.  In less than one month, Lombardo completed an expert report concluding that the DMX4 had not sustained any damage or loss of reliability.  Based in part on Lombardo's report, Defendant denied coverage for the DMX4's alleged loss, and Plaintiff thereafter filed the instant declaratory judgment action.

Both parties ultimately filed the instant cross motions for summary judgment. Plaintiff also moved to exclude Lombardo's opinions.  Following a *Daubert* Hearing on May 23, 2013, the Court granted Plaintiff's motion, excluding Lombardo's opinions regarding the

4

alleged lack of damage to the DMX4, but permitting Lombardo to potentially testify as a lay witness regarding the replacement value of the VMAX.  (*See* Doc. # 112).

The Court now turns to the pending cross motions for summary judgment.

## II.   ANALYSIS

### A.   Standard of Review

#### 1.   Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be

5

granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

### 2.    Insurance coverage actions

In a declaratory judgment action regarding an insurance policy, the initial burden is on the insured to establish that the incident at issue was within the scope of the policy. *Secura Insurance Company v. Gray Construction, Inc.*, 717 F. Supp. 2d 710, 714-15 (W.D. Ky. 2010), modified on clarification (July 12, 2010). If the insured demonstrates that coverage exists, the burden then shifts to the insurer to establish that an exclusion bars coverage. *Id.* at 715.

To determine whether coverage exists, the Court begins by interpreting the relevant insurance contract as a matter of law. *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 810 (Ky. Ct. App. 2000). "The primary object in construing a contract . . . is to effectuate the intentions of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002). The parties' intentions are to be discerned from the four corners of the contract. *Id.* In the absence of any ambiguities, the terms will be enforced as written. *McMullin v. McMullin*, 338 S.W.3d 315, 320 (Ky. Ct. App. 2011) (citing *Whitlow v. Whitlow*, 267 S.W.2d 739, 740 (Ky.1954)).

6

"A contractual provision is ambiguous if the provision is susceptible to multiple or inconsistent interpretations." *McMullin*, 338 S.W.3d at 320. Contractual terms are assigned their ordinary meaning, *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 106 (Ky. 2003), and courts are "simply unwilling to torture words to import ambiguity into a contract where the ordinary meaning leaves no room for ambiguity." *First Home, LLC v. Crown Communications, Inc.*, No. 2010–CA–001701–MR, 2012 WL 95560 at *5 (Ky. Ct. App. Mar. 15, 2012). However, the contract should be liberally construed and all ambiguous terms resolved in favor of the insured. *Ky. Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992). Unambiguous words or phrases may become ambiguous when applied to particular claims. *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 227 (Ky. 1994).

**B.    The phrase "direct physical loss or damage" includes a loss of reliability**

The Policy "insures against all risks of *direct physical loss or damage* to insured property except as excluded under this policy." (Doc. # 70-4, at 18) (emphasis added). The central question for the Court is whether the phrase "direct physical loss or damage" includes a loss of reliability suffered by a data storage network due to heat exposure.

As a federal court sitting in diversity, the Court's task is to predict how the Kentucky Supreme Court would rule if it were deciding this question of state law. *National Sur. Corp. v. Hartford Cas. Ins. Co.*, 493 F.3d 752, 755 (6th Cir. 2007) (internal citation and quotation omitted). No Kentucky court has addressed this question, and the Sixth Circuit has only addressed it once. *See Universal Image Productions, Inc. v. Federal Insurance Co.*, 475 F. App'x. 569 (6th Cir. 2012) (holding that mold contamination did not constitute "direct physical loss or damage" to a building because it did not physically alter the building's

7

structure and did not render the building uninhabitable).  That decision is inapplicable here because it applied Michigan law and unlike this case, it did not involve an allegation of physical alteration to the insured property.  In addition, the Kentucky cases the Court has reviewed provide no guidance as to how the Kentucky Supreme Court would decide this question.  And, neither party has cited a factually analogous case, nor has the Court's independent research uncovered one.  Accordingly, the Court will address this question as a matter of first impression.

As an initial matter, the parties dispute whether the term "physical" modifies the term "damage."  Neither of these terms are defined in the Policy (nor is the term "loss" defined, for that matter).  Naturally, Defendant argues that "physical" does modify "damage," while Plaintiff argues it does not.  However, even if the Court were to adopt Defendant's interpretation, the Court would still find that coverage exists.  Therefore, since it need not resolve this issue, the Court assumes without holding that the term "physical" modifies the term "damage."

The Court presses on to the heart of the matter.  Plaintiff contends that the DMX4's loss of reliability constitutes "direct physical loss or damage" for three reasons.  First, it asserts that the DMX4's components were physically altered by the overheat event.  Second, it contends that this physical alteration compromised the system's reliability, even though it could still function after the overheat event.  And third, because the system's reliability is the "entire function or purpose of the unit" (Doc. # 70-1, at 17), and the purpose of insuring the unit was to protect that reliability, Plaintiff posits that the loss of reliability is a covered event.  Plaintiff emphasizes that this reliability is essential because "[a] device that could provide 80% availability would be a completely different device due to the

importance of the data it stores and the severity of the consequence if the data is unavailable." (Doc. # 70-1, at 17). It contends that the if the Court ignores the reliability of the DMX4, its insurance coverage becomes illusory.

Defendant takes the opposite view. It contends that "direct physical loss or damage" does not include a loss of reliability for two reasons. First, it asserts that a loss of reliability is an "intangible" or "non-physical" concept, and that to prove "direct physical loss or damage" Plaintiff must present "*distinct, demonstrable*, physical alteration of the property" that is "tangible" or "perceptible" to the senses. (*Id.* at 17) (emphasis added). Second, it posits that coverage does not exist unless this demonstrable physical alteration rendered the DMX4 unable to function.

The Court agrees with Plaintiff that the phrase "direct physical loss or damage," as applied to Plaintiff's data storage network, encompasses a loss of reliability caused by excessive temperature. There are two reasons the Court makes this finding. First, the component damage at issue here is undeniably "direct" and "physical": it is "direct" because the harm flows immediately or proximately from the heat exposure, and it is "physical" because the harm results from physical alteration to the components themselves.

It is undisputed, for instance, that disk drive damage occurs on a microscopic level through a process called "ionic migration," in which "lubricants are thinned or . . . move around because they're more fluid [as a result of heat exposure]." (Doc. # 69-8, at 48). It is also undisputed that heat exposure can degrade the disk drives "Annualized Failure Rate," meaning their annual risk of failure—or in other words, their reliability. There is no question, therefore, that degradation of a disk drive's Annualized Failure Rate due to heat exposure is a *physical* process. The Court therefore rejects Defendant's contention that

a loss of reliability is "clearly [an] intangible/non-physical concept" and that to "equate [it] to direct physical loss or damage would render the word 'physical' . . . meaningless." (Doc. # 71-1. at 24).

The Court also rejects Defendant's contention that the Policy requires Plaintiff to produce visible proof of disk drive damage by conducting physical testing such as a "tear down analysis."  EMC's Frederick Sproule explained that a tear down analysis is not only extremely time-consuming, expensive, and labor intensive, but also quite frequently yields inconclusive results.  (Doc. # 69-3, at 21).  Perhaps this is why Defendant itself never conducted this test or any other physical testing, despite receiving an extension of time from this Court to do so.  Given the inherent difficulty at play, the Court holds that visibly witnessing microscopic disk drive damage is not required to prove a loss of reliability.

Second, the Court declines Defendant's invitation to interpret the phrase "direct physical loss or damage" as requiring proof that the DMX4 permanently lost its ability to function.  Adopting this view would ignore both the core function and value of the DMX4, and the purpose of insuring it.  As stated above, the core function and value of the DMX4 is to provide Plaintiff 99.999% guaranteed reliability of critical data.  According to Chad Phipps, Plaintiff's head of Information Technology, the Hospital chose to spend top dollar on the DMX4, rather than settling for a less expensive storage network, because the DMX4 offered the highest guarantee of reliability.  (Doc. # 69-4, at 49).  In short, its value—its insurable risk—is its reliability.

Were the Court to hold that in order to obtain coverage, Plaintiff must await the DMX4's total failure and the concomitant loss of critical patient data, it would defeat the objective of insurance.  This principle was aptly explained by the Seventh Circuit in *Eljer*

10

*Manufacturing, Incorporated v. Liberty Mutual Insurance Company*, 972 F.2d 805 (7th Cir. 1992). The question in that case was as follows:

> If a manufacturer sells a defective product or component for installation in the real or personal property of the buyer, but the defect does not cause any tangible change in the buyer's property until years later, can the installation itself nonetheless be considered a 'physical injury' to that property?

*Id.* at 808. At issue were a large number of claims against the manufacturer of defective plumbing systems. *Id.* at 807. Some of the claims involved systems that had leaked, and some involved systems which had not yet leaked, but which the property owners replaced in anticipation of a leak. *Id.* The appellate court was asked to determine whether, for insurance purposes, the "physical injury" to property occurs when the defective plumbing system is installed, when it leaks, or at some point in between. *Id.* at 808-809.

The court held that the injury occurred when the systems were installed because the defective plumbing system was "like a time bomb placed in an airplane luggage compartment: harmless until it explodes. Or like a silicone breast implant that is harmless until it leaks. Or like a defective pacemaker which is working fine now but will stop working in an hour." *Id.* at 807, 814. The Court went on to explain that the purpose of having insurance is to protect against the risk of a large loss, not just to provide reimbursement after the loss has occurred:

> The central issue in this case—when if ever the incorporation of one product into another can be said to cause physical injury—pivots on a conflict between the connotations of the term "physical injury" and the objective of insurance. The central meaning of the term as it is used in everyday English . . . is of a harmful change in appearance, shape, composition, or some other physical dimension of the "injured" person or thing. If water leaks from a pipe and discolors a carpet or rots a beam, that is physical injury, perhaps beginning with the very earliest signs of rot . . . . The ticking time bomb, in contrast, does not injure the structure in which it is placed, in the sense of altering the structure in a harmful, of for that matter in any, way—until it

11

explodes.  But these nice, physicalist, "realistic" (in the philosophical sense) distinctions have little to do with the objectives of parties to insurance contracts.  The purpose of insurance is to spread risks and by spreading cancel them.  Most people (including most corporate executives) are risk averse, and will therefore pay a premium to avoid a small probability of a large loss.   Once a risk becomes a certainty—once the large loss occurs—insurance has no function.

*Id.* at 808-09.

The heat-exposed data storage components in this case are like the hyperbolic ticking time bomb referenced by the Seventh Circuit: harmless until they fail.  For insurance purposes, the "loss" or "damage" occurs when the components were exposed to excessive heat, not when the components fail.  A contrary holding would frustrate the risk-spreading objectives of insurance.  Moreover, the argument for coverage is even stronger in this case than it was in *Eljer* because in that case there was no allegation of physical alteration to the residences at issue, whereas in this case Plaintiff has alleged physical alteration to the DMX4's components.

Defendant cites several cases for the proposition that "direct physical loss or damage" does not encompass a loss of use, access, function, or reliability.  However, these cases are inapposite because, unlike the instant case, they do not involve damage to the insured property itself.  For instance, in *America Online, Inc. v. St. Paul Mercury Insurance Company*, 207 F. Supp. 2d 459, 461, 470 (E.D. Va. 2002), customers sued AOL claiming that its internet access software caused damage to their computers, computer data, software, and systems by causing their computers to freeze and to crash.  AOL's general liability policy provided that its insurer would pay the amounts AOL was legally required to pay for property damage, which the policy defined as "physical damage to tangible property of others."  *Id.* at 462.  The district court held that St. Paul had no duty to defend AOL

12

against the customers' claims for damage to their computer data, software and systems because those items are not "tangible" property. *Id.* at 462. It further found that although the customers' computers *were* tangible property, the customers had not alleged physical injury to the "body or substance" of the computers. *Id.* at 469. *See also*, *North River Ins. Co. v. Clark*, 80 F.2d 202, 203 (9th Cir. 1935) (locomotive not "damaged" when bridge burned, leaving it stranded and useless to its owner); *Source Food Technology v. USF&G Co.*, 465 F.3d 834, 835 (8th Cir. 2006) (Canadian company's truckload of beef that was not permitted to enter the United States due to a legal regulation did not sustain "direct physical loss" because the beef itself was not contaminated); *Pentair, Inc. v. American Guar. and Liability. Ins. Co.*, 400 F.3d 613, 614 (8th Cir. 2005) (corporation did not sustain "direct physical loss or damage" when two of its Taiwanese factories suffered a power outage because the factories themselves were undamaged).

Each of Defendant's cited cases are therefore inapposite because unlike the computers in *America Online*, the locomotive in *Clark*, the beef in *Source Food*, and the Taiwanese factories in *Pentair*, the DMX4's components were physically compromised, as described below. Therefore, the Court holds that the phrase "direct physical loss or damage" is unambiguous and includes a loss of reliability caused by excessive temperature.

In the alternative, to the extent that there is any ambiguity in the phrase, the Court resolves the ambiguity in favor of Plaintiff in order to protect its reasonable expectations of coverage. The doctrine of reasonable expectations provides that "the insured is entitled to all the coverage he may reasonably expect to be provided under the policy. Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to

13

exclude coverage will defeat that expectation." *Simon v. Continental Insurance Company*, 724 S.W.2d 210, 212 (Ky. 1987).  The Kentucky Supreme Court has explicated the doctrine as follows:

> An insurance company should not be allowed to collect premiums by stimulating a reasonable expectation of risk protection in the mind of the consumer, and then hide behind a technical definition to snatch away the protection which induced the premium payment.

*Aetna Cas. & Sur. Co. v. Kentucky*, 179 S.W.3d 830, 837 (Ky. 2005).  Here, Plaintiff's expectation was that Defendant would provide coverage if the DMX4's components lost reliability due to heat exposure.  Defendant should not be allowed to collect premiums from Plaintiff and then assert that it was only insuring microscopic disk drive damage visible to the human eye that causes total system failure.   This is especially true given that Defendant *itself* struggled with how to interpret the phrase "direct physical loss or damage." Defendant's adjustor, Terry MacKenzie, wrote to Plaintiff that Defendant needed to determine whether the DMX4 "has been compromised, i.e. damaged."  (Doc. # 70-11, at 3).

The Court therefore holds that even if there is ambiguity in the Policy's language, coverage exists for a loss of reliability.  Having determined the meaning of the phrase "direct physical loss or damage" as a matter of law, the Court must consider whether a genuine dispute of material fact exists regarding whether such loss or damage occurred in this case.

## C.   Plaintiff has met its burden of establishing coverage

The Court finds that Plaintiff has met its burden of demonstrating that there is no genuine dispute as to any material fact regarding whether the DMX4 suffered a loss of

14

reliability due to excessive temperature.    The relevant facts and testimony are uncontroverted.  First, there is no dispute that the DMX4's internal temperature exceeded the vendor specifications, the component specifications, and EMC's internal specifications. (*See* Doc. # 70-1, at 12 (citing Doc. # 69-3, at 13, 21, & 57)).   Plaintiff has produced readings from thermostats inside the DMX4 showing an average temperature of 155.7 degrees Fahrenheit.  (Doc. # 70-3, at 4).  Defendant has offered no proof to controvert the fact that the DMX4 exceeded all relevant heat specifications.    This fact thus stands undisputed.[1]

Second, there is no dispute that during the overheat event, hundreds of components failed, including dozens of disk drives, dozens of directors and director boards, batteries and circuit boards.  (Doc. # 69-3, at 14).  Third, there is no genuine dispute that exceeding the disk drive manufacturer's heat specifications is linked to degradation of the disk drives's Annualized Failure Rate.  Seagate's Manual clearly states that in order to maintain the disk drives' Annualized Failure Rate, the drives should not be operated above 50 degrees Celsius.  (Doc. # 70-9, at 40).  While it states that "[o]ccasional excursions . . . above [50 degrees Celsius] may occur without impact to the specified AFR," it also states that the maximum allowable temperature is 60 degrees Celsius.  *Id.*  The DMX4's drives exceeded

---

[1] While Defendant notes that Plaintiff has not established what the ambient room temperature was inside the data center, the Court finds that this alleged fact is immaterial.  The cause of the overheating is not relevant to coverage, unless it triggers an exclusion.  And even if it were material, Plaintiff's expert, Frederick Sproule, has explained that the DMX4's internal thermal sensors have a direct correlation to the ambient data center temperature.  (Doc. # 69-3, at 59-60). Specifically, the disk drives run about eight to ten degrees Celsius above the ambient air temperature.  (*Id.* at 21).  Based on this correlation, Sproule estimates that the data center reached 155 to 170 degrees Fahrenheit, more than twice the maximum temperature permitted by the disk drive manufacturer.  (*Id.* at 52).  Defendant has not introduced proof contradicting this estimate.

this temperature by an average of six to eight degrees.  Defendant has offered no proof that the drives can be operated above 60 degrees Celsius without degrading their Annualized Failure Rate.

Fourth, there is no dispute that during the overheat event, the DMX4 dialed home to EMC to report multiple high temperature error codes, and that these codes signified that the DMX4's components had failed from over-temperature conditions, including catastrophic disk drive fault whereby disk drives could no longer read or write new data.  There is also no dispute that two disk drives reported high temperature error codes and required replacement.  Defendant has offered no evidence to controvert the existence of or the significance of the error codes, or the fact that two disk drives required replacement following the overheat event.

Fifth, despite Defendant's protestations, there is no genuine dispute that the DMX4 suffered a loss of reliability as a result of the overheat event.  The EMC Event Report concluded that based upon the temperature extremes which violated relevant heat specifications, and the dial-home events, the DMX4 had been "severely compromised" and EMC could "no longer confirm the long-term reliability of the [DMX4's] equipment . . . ." (Doc. # 70-3, at 5).  In addition, Frederick Sproule testified that after monitoring of the error codes in real time during the overheat event, working with a group of 6 to 8 EMC engineers to analyze the codes, and considering the DMX4's internal temperatures, he concluded that the damage to the DMX4 was "severe, extreme, excessive, very damaging . . . catastrophic." (Doc. # 69-3, at 52).  He also testified that due to the heat exposure, "the sum of the parts in the system and the components in the system . . . render[ed] the system unreliable" (*id.* at 13), and the "long-term reliability of the system has been compromised

16

because of the thermal event that occurred at the customer site." (*Id.* at 18).  He thus advised Plaintiff that it had no choice but to replace the DMX4, and that it would be "foolish" if it continued to use any part of the DMX4 that had been "electrochemically over stressed and electrically compromised."  (*Id.* at 38).

The Court is cognizant that on a motion for summary judgment, it may not weigh the credibility of witnesses.  *Dawson v. Dorman*, No. 12–6163, 2013 WL 2397410, at *2 (6th Cir. June 3, 2013) (citation omitted).  However, summary judgment is proper "when challenges to witness[ ] credibility are *all* that a [party] relies on, and he has shown no independent facts—no proof—to support his claims . . . ."  *Id.* (quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir.2008) (emphasis in original).  To avoid summary judgment, the non-movant must "offer[ ] specific facts that call into question the credibility of the movant's witnesses."  *Dawson*, *supra* (quoting *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004)).  As the Sixth Circuit has put it, the "prospect of challenging a witness'[s] credibility is not alone enough to avoid summary judgment."  *Dawson*, *supra* (citation omitted).

Here, Defendant relies solely on a challenge to Sproule's credibility.  It has not offered specific admissible facts or testimony to call into question the credibility of either Sproule's opinion or EMC's opinion regarding the DMX4's loss of reliability.  To be sure, Defendant has offered evidence that the DMX4 *continued to function* in some capacity for six months after the overheat event,[2] and that Plaintiff, if it wished, could have continued

---

[2] It is unclear from the record whether the DMX4 was storing any *new* data after it was restored following the overheat event, though it appears that the DMX4 was not receiving new data because Plaintiff made the almost immediate decision following the overheat event to start transferring data off of the DMX4 and onto the VMAX.

using the DMX4 and paid for maintenance on a time and material basis.  (Doc. # 69-3, at 57).  Sproule's opinion, however, was that the DMX4 sustained a loss of long-term reliability *notwithstanding* its short-term ability to function.  As he explained

> the system was in an operational state.  However, we feel it's been compromised.  We're very confident it's been compromised.  A year from that [overheat] event, if it was still in use, the customer may have likely incurred excessive fallout from the thermal stress that the system encountered.

(Doc. # 69-3, at 40).  In other words, its short-term ability to function was not indicative of its long-term reliability.  Thus, Defendant's evidence regarding functioning is immaterial and does not call Sproule's credibility into question.   Sproule's opinion is therefore uncontroverted.

Based upon all of the aforementioned uncontradicted facts, no rational fact finder could find that the DMX4 did not suffer a loss of reliability due to heat exposure.   *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998) ("If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted.").   Coverage therefore exists.[3]  The Court now turns to examine whether any of the Policy's exclusions apply or whether the Policy should be voided for the reasons advanced by Defendant.

**D.    The Policy's exclusions do not apply, and Affiliated FM's defenses to coverage lack merit**

**1.    The temperature exclusion and the "loss of use" and "indirect or remote loss" exclusion do not apply**

The policy contains a perils exclusion regarding loss or damage caused by

---

[3] Because the Court finds that coverage exists under the "direct physical loss or damage" provision, it need not address Plaintiff's arguments that coverage also exists under the data loss provision or the business interruption provision, or under its duty to mitigate its damages.

18

temperature changes, which reads as follows

> This policy does not insure against loss or damage caused by the following; *however, if direct physical loss or damage insured by this policy results, then that resulting direct physical loss or damage is covered.*
>
> (. . .)
>
> 4.  Dampness or dryness of atmosphere; changes of temperature; freezing, except damage to fire protective equipment caused by freezing; heating; shrinkage; evaporation; depletion; erosion; loss of weight, change in color, flavor or finish; rust; corrosion . . . .

(Doc. # 70-4, at 36) (emphasis added).

The policy also contains a perils exclusion for loss of use and indirect or remote loss.

It provides as follows

> This policy does not insure against loss or damage caused directly or indirectly by or resulting from any of the following. Loss or damage is excluded regardless of any other cause or event whether of not insured under this policy that contributes concurrently or in any sequence to the loss of damage.
>
> (. . .)
>
> 3. . . . loss of market; loss of use.
>
> 9.  Indirect or remote loss.

(Doc. # 70-4, at 33-35).

Neither of these exclusions apply here because neither exclusion bars coverage when *direct* physical loss or damage has occurred.  The temperature exclusion expressly provides that "if *direct* physical loss or damage insured by this policy results [from a change in temperature], then that resulting direct physical loss or damage is covered." (Doc. # 70-4, at 36) (emphasis added). Since the Court has found that the overheat event caused direct physical loss or damage, the temperature exclusion is inapplicable.  For the same reason, the indirect or remote loss exclusion is inapplicable.  There was nothing "indirect"

19

or "remote" about Plaintiff's loss.  As stated above, Plaintiff's loss was "direct" meaning "immediate" or "proximate."

Finally, the "loss of use" exclusion does not apply.  This phrase is not defined in the Policy, and Defendant offers the Court neither an interpretation of it or case law construing it.  It merely argues that "[b]oiled down, [Plaintiff's] allegations in this case equate to loss of use of the DMX4," and that this loss of use is excluded under the provision.  (Doc. # 71-1, at 27-28).  However, the exclusion cannot be so broad as to encompass *all* loss of use of insured property.  Construing the provision in this fashion would swallow up the coverage portion of the Policy, since by definition, damaged property may also be unusable.

Instead, the Court reads the exclusion as barring certain *consequential damages* resulting from direct physical loss or damage.  For instance, in *Manson Growers Cooperative v. Mutual Service Casualty Insurance Company*, No. 98-35927, 2000 WL 831813 at *1 (9th Cir. June 27, 2000), the insured's packing facility collapsed due to snow and ice accumulation on the roof, damaging apples contained therein and causing it to suspend its apple-packing operations.  Apples contained in a nearby facility were undamaged, but packing of these apples was delayed due to the collapse of the first facility, forcing the insured to sell the apples at lower prices to mitigate its damages.  *Id.*  The insured recovered for the damage to the collapsed facility, and to the apples inside the facility, under an insurance policy covering "direct physical loss of or damage to property," but the insurer denied the insured's claim for the mitigation damages to the undamaged apples under an provision excluding coverage for "any loss due to delay, loss of use, loss of market, or any other consequential loss . . . ."  *Id.*

20

The Ninth Circuit held that the undamaged apples clearly fell within the exclusion, and that the insured could not circumvent the exclusion by characterizing their mitigation damages as an "intangible" form of property damage.  *Id.*  In other words, the appellate court held that the loss of use exclusion barred consequential damages resulting from the *loss of use* of the physically damaged facility, such as costs flowing from delays in packing operations.  *Id.*; c*f. Am. Online*, 347 F.3d at 98 (holding that a loss of use provision "places a limitation on the coverage of consequential damages, restricting coverage to loss of use of [property] that [is] physically damaged.").  In this case, though, Plaintiff does not seek consequential damages; it seeks replacement damages for direct physical loss or damage to the DMX4.  The exclusion thus does not apply here.

**2.     The Policy is not voided due to Plaintiff's failure to submit a proof of loss**

Defendant asserts that Plaintiff undisputedly failed to submit a signed, sworn proof of loss within sixty days, as required by the Policy.  (Doc. # 70-4, at 9).  It argues that this omission voids the Policy under the fraud concealment provision, which applies where the insured has "wilfully concealed or misrepresented any material fact or circumstance concerning this insurance . . . ."  (*Id.*).  It also argues that this omission violates the Policy's provision stating that "[n]o suit or action on this policy for the recovery of any claim shall be sustainable in any court . . . unless all the requirements of the policy shall have been complied with."  (*Id.*).  Plaintiff concedes that it did not file a proof of loss, but argues that Defendant either waived the proof of loss provision or should be estopped from asserting it because (1) Defendant never requested that Plaintiff submit a proof of loss, and (2)  its senior adjuster, Terry MacKenzie, did not cite the proof of loss deadline as a reason for

denying Plaintiff's claim.  (Doc. # 86, at 38).  Defendant responds that the policy required any waiver to be in writing.  (Doc. # 71-1, at 36) (citing a Policy provision stating "[n]o . . . waiver of any provision [shall be] valid, unless granted herein or expressed in writing added hereto.").

"In an action on an insurance policy, the insured must prove compliance with the policy's conditions precedent or a waiver thereof to recover under its terms."  *Am. Centennial Ins. Co. v. Wiser*, 712 S.W.2d 345, 346 (Ky. Ct. App. 1986).  "[A] waiver exists only where one with full knowledge of a material fact does or forbears to do something inconsistent with the existence of the right or of his intention to rely upon that right."  *Harris Bros. Const. Co. v. Crider*, 497 S.W.2d 731, 733 (Ky. 1973).  As a leading treatise has explained, "the well-known rule regarding waiver of contractual requirements [is that a] party to a contract may by express agreement or by his own course of conduct waive his legal right to insist on strict performance of the covenants of the contract."  13 Williston on Contracts § 39:27 (4th ed. 2011) (citation and internal quotation omitted).  In particular, an insurer may waive a proof of loss requirement.  16 Williston on Contracts § 49:110 (4th ed. 2013) ("[A]n insurer may waive the requirements relating to proof of loss, either expressly, or by conduct on the part of the insurer or its authorized agent inconsistent with an intention to enforce strict or even substantial compliance with those requirements.").

During the nearly one year long period of interaction between the parties following the overheat event, Defendant never once requested that Plaintiff submit a proof of loss, never sent Plaintiff a proof of loss form, and never even broached the topic of a proof of loss, despite frequent communication between the parties.  Defendant contends that it "reminded" Plaintiff of the proof of loss requirement by inserting boilerplate language at the

22

bottom of a letter from MacKenzie. (Doc. # 71-1, at 38). That language read: "[Defendant] expects [Plaintiff] to comply with the requirements in case of loss with regard to this claim." (*Id.*). As an initial matter, this language does not request that Plaintiff submit a proof of loss. Moreover, this language does not even clearly refer to the Policy's proof of loss provision. As Plaintiff notes, the Policy contains no provision entitled "requirements in case of loss." Instead, it contains a proof of loss provision entitled "requirements in case loss occurs." (Doc. # 70-4, at 9).

Plaintiff's outside counsel raised this point in a letter to MacKenzie on November 15, 2010, prior to litigation. He wrote:

> Your letter states that [Defendant] expects [Plaintiff] to comply with the requirements in case of loss with regard to this claim. Because no language in the Policy specifically identifies any requirements in case of loss, please identify all requirements to which your statement refers.

(*See* Doc. # 86, at 40-41). MacKenzie sent Plaintiff several subsequent letters but never responded to Plaintiff's question.

In addition, neither MacKenzie nor any other representative of Defendant has ever cited Plaintiff's failure to submit a proof of loss as a reason for denying its claim. In fact, as recently as her April 9, 2012 deposition in this matter, the only basis MacKenzie cited for denying Plaintiff's claim was its alleged failure to prove physical damage. (*See* Doc. # 86, at 38).

The Court finds that based upon the entirety of the circumstances, Defendant waived its right to insist upon Plaintiff's compliance with the proof of loss provision.[4] Its

---

[4] It is irrelevant that the Policy required any waiver of the proof of loss provision to be in writing. (See Doc. # 71-1, at 36) (citing a Policy provision stating that "[n]o . . . waiver of any provision [shall be] valid, unless granted herein or expressed in writing added hereto."). Kentucky

conduct was  "inconsistent with . . . [its] intention to rely upon" that provision, *Harris Bros.*, 497 S.W.2d at 733, and inconsistent with an intention to "enforce strict or even substantial compliance with" that provision.  Williston, *supra* at § 49:110.

This analysis is not altered by the four cases cited by Defendant, in which courts voided policies due to the insured's failure to submit a timely proof of loss.  In three of those cases, the insurer requested that the insured submit a proof of loss.  *See One Beacon Ins. Co. v. Chiusolo*, No. 5:05-201-JMH 2007 WL 1728707, at *3 (E.D. Ky. June 13, 2007); *Great American Ins. Co. of New York v. Brock Const. Co., Inc.*, No. Civ.A.05-569-KKC, 2007 WL 2844945 at *4 (E.D. Ky. Sept. 28, 2007); *Cothran v. Hartford Acc. & Indem. Co.*, No. Civ.A.88-0105-P(J), 1989 WL 165010, at *1 (W.D. Ky. Feb. 10, 1989).  While not expressly stated by those courts, waiver was inapplicable because the insurer's act of requesting a proof of loss was consistent with its intention to enforce the condition precedent requiring a proof of loss.

In the fourth case, the insured never argued that the insurer failed to request a proof of loss, and thus that issue was not before the court.  *Am. Centennial Ins. Co. v. Wiser*, 712 S.W.2d 345 (Ky. Ct. App. 1986).  Defendant's cases are therefore distinguishable.  Its proof of loss argument is without merit.

### 3.    Plaintiff did not make material misrepresentations

Defendant argues that Plaintiff "misrepresented to [Defendant] on numerous

---

law only enforces insurance contracts to the extent that they do not contravene the law.  *Great American Ins. Co. of New York v. Brock Const. Co., Inc.*, No. Civ.A.05-569-KKC, 2007 WL 2844945 at *4 (E.D. Ky. Sept. 28, 2007) (citation omitted).  Here, the waiver provision contravenes Kentucky law providing that waiver can occur in specified circumstances.  *See, e.g.*, *Harris Bros.*, 497 S.W.2d at 733.

occasions that the replacement VMAX that it purchased was of like kind and quality to the DMX4." (Doc. # 71-1, at 32).  Because the Court finds below that the VMAX and the DMX4 are of like kind and quality, the Court concludes that Plaintiff made no misrepresentations regarding the VMAX.

Having determined that none of the Policy's exclusions apply and that Affiliated FM's defenses to coverage lack merit, the Court now turns to the issue of damages.

**E.      The VMAX and the DMX4 are of like kind and quality**

Plaintiff contends that the replacement VMAX—including its hardware, software, and service contracts—is a reimbursable cost under the Policy.[5]  The Policy provides that in the event of a covered loss, "the adjustment of loss amount . . . will be determined based on the cost of repairing or replacing (whichever is lesser), at the time of loss, with materials or equipment of like kind and quality . . . ." (Doc. # 70-4, at 40).  The phrase "of like kind and quality" is undefined in the Policy.  However, the Policy does provide some guidance as to its meaning.  It specifies that for "[u]nrepairable . . . electronic data processing equipment," such as the DMX4's disk drives, the basis of valuation is "the cost to replace with equipment that is the most functionally equivalent to that damaged, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program enhancement." (*Id.*).  The Court interprets this provision to mean that a replacement unit is "of like kind and quality" if it is "the most functionally equivalent" in quality to the replaced unit.

---

[5] Plaintiff does not specifically identify the constituent parts of the VMAX, but Defendant's witness, Lombardo, identifies them in his report.  (*See* Doc. # 71-20).

Two of Plaintiff's witnesses offered testimony supporting the conclusion that the VMAX and the DMX4 are of like kind and quality. First, Frederick Sproule called the VMAX a "modern version" of the DMX4, and he compared the VMAX to a newer version of the same car model. In his words, the DMX4 "is a 2008 Cadillac, and the VMAX is a 2010 Cadillac." (Doc. # 69-3, at 56). When asked whether either of the units was better than the other, he opined that the VMAX is simply "a more recent model," and that both units are "very capable enterprise class systems," despite "vast [technical] differences" between the two products. (Doc. # 69-3, at 37, 38, 55). As explained by both Sproule and Chad Phipps, Plaintiff's head of Information Technology, an enterprise class system is a top of the line, high-end data storage network designed to deliver the highest level of data storage reliability. Second, Phipps testified that despite technical differences, the DMX4 and the VMAX are "essentially the same. One's a newer model of the other . . . One's this year's car; one's last year's car." (Doc. # 69-4, at 18).

Defendant contends that the VMAX and the DMX4 are not of like kind and quality to the DMX4 for four reasons. First, it points out that the VMAX has more than double the disk storage capacity and total memory capacity than the DMX4. However, Defendant has failed to introduce proof showing that the quantitative memory and storage capacity differences equate to a qualitative difference under the Policy. Indeed, Defendant's counsel asked Sproule during his deposition whether a "more appropriate comparison" between the two units would be that "a DMX4 is a Cadillac, and the VMAX is a Rolls Royce." (Doc. # 69-3, at 56). Sproule rejected the analogy, saying that the DMX4 "is a 2008 Cadillac, and the VMAX is a 2010 Cadillac." (*Id.*). He explained that the VMAX was a "reasonable substitute" for the DMX4, and that the two units perform the "same core

26

functions." (*Id.* at 55-56).  Notwithstanding the questions of Defendant's counsel, therefore, Sproule's uncontradicted testimony is that the two units are functionally equivalent.

Second, Defendant contends that an identical DMX4 system was available for purchase following the overheat event, according to Sproule and to Plaintiff's Rule 30(b)(6) designee and adjustor, Brian Cook.  However, Plaintiff correctly points out that Sproule never said a comparable DMX4 was immediately available for purchase; instead, he said that a comparably equipped DMX4 would have to be ordered and manufactured to specification which would have taken weeks.  (*Id.* at 54-55).  Similarly, it notes that Brian Cook testified that no replacement DMX4 was 'on the shelf' but instead would have to be built.  (Doc. # 71-10, at 10).  Accordingly, there is no proof that a comparable DMX4 was *immediately* available for purchase following the overheat event.  This fact is important because Plaintiff reasonably concluded that it needed to replace the DMX4 immediately given its unreliability and the Hospital's critical need to protect its data.  Moreover, nowhere does the Policy require that Plaintiff delay replacing the DMX4 until a less expensive model becomes available.

Third, Defendant highlights the fact that the VMAX includes a software package that was not included with the DMX4.  However, it has presented no proof that the VMAX could function without the software.  By contrast, Sproule testified that Plaintiff had to purchase the software because it could not have used the DMX4's software with the VMAX, either because of licensing or incompatibility problems.  (Doc. # 69-3, at 56).

Fourth, according to Defendant's witness, Frank Lombardo, in determining an accurate replacement cost the Court should remove the cost of the service contracts Plaintiff purchased for the VMAX.  (Doc. # 71-20, at 5-6).  On this point, the Court agrees.

Plaintiff has not introduced any evidence showing that these service contracts are reimbursable under the Policy, and the Court will therefore exclude them.  The Court will thus require Plaintiff to submit a revised statement of its damages without the cost of the service contracts, and it will permit Defendant to file a response regarding the accuracy of Plaintiff's revised statement.

Setting aside the service contracts issue, however, the Court finds that Defendant has failed to create a genuine dispute of fact as to whether the two units are of like kind and quality.  Sproule's uncontroverted testimony establishes that both units are functionally equivalent enterprise class systems.  Therefore, regarding damages, the Court will grant Plaintiff's motion for summary judgment as to the cost of the VMAX's hardware and software, and deny the motion as to the VMAX's service contracts.

### III.    CONCLUSION

Accordingly, for the reasons stated herein, IT IS ORDERED as follows:

(1)    Plaintiff's Renewed and Restated Motion for Declaratory Judgment (Doc. # 70) is hereby **GRANTED as to coverage** and **GRANTED IN PART** and **DENIED IN PART as to damages** consistent with the terms and conditions of this Order**;**

(2)    Defendant's Motion for Summary Judgment (Doc. # 71) is hereby  **DENIED as to coverage** and **GRANTED IN PART** and **DENIED IN PART as to damages** consistent with the terms and conditions of this Order**;**

(3)    On or before **August 30, 2013**, Plaintiff shall submit a revised statement of its damages without the service contracts note above;

(4)    Within fourteen (14) days of Plaintiff's filing of its damages statement, Defendant shall file a response regarding the accuracy of Plaintiff's statement; and

(5)     Judgment shall be entered after the Court has decided the proper amount of

damages.

This 14th day of August, 2013.



Signed By:

David L. Bunning

United States District Judge

G:\DATA\Opinions\Ashland\0-11-16 MOO granting in part and denying in part MSJ.wpd